IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B&B MICROSCOPES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | ) Civil Action No. 06-492 |
| LUIGI ARMOGIDA, | ) |
| | ) |
| Defendant. | ) |

AMBROSE, Chief District Judge.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

*B&B's Business*

1.   B&B Microscopes, Ltd. ("B&B") is engaged in the business of selling microscopes and imaging products in the states of Pennsylvania, Delaware, West Virginia, Ohio and Kentucky.

2.   B&B is a distributor of Olympus America, Inc. ("Olympus") products.

3.   The products themselves include very sophisticated imaging and microscope equipment with prices reaching into the hundreds of thousands of dollars.

4.   B&B's business has changed over time.  It started selling basic microscopes for low end research.  Now it targets the high end research market.  It takes hardware and software and integrates them and adapts them to the customer's

1

needs.  The imaging side of the business has increased in importance to B&B and now drives the microscope sales.

5.  In fact, B&B offers imaging software packages, including a package known as MicroSuite, which allows B&B to provide customized imaging solutions to its customers.

6.  B&B employs both microscope sales representatives and imaging specialists.  Their territories overlap and imaging specialists work with the sales representatives on imaging system sales.

7.  The focus on imaging drives who B&B looks for in imaging specialist employees.  It looks for smart people who can ascertain customer needs, who have programming capabilities and who can think creatively.

8.  Imaging specialists typically work longer than a 9 to 5 workday because they must be responsive to their customers' needs.

*The Hiring of Armogida and His Job Duties*

9.  Andre Domino, a B&B manager, introduced Luigi Armogida ("Armogida") - his nephew - to B&B.  Domino believed that Armogida's computer skills would prove beneficial to B&B.

10.  In seeking employment with B&B, Armogida represented that he had advanced knowledge of computer hardware, operating systems, software, networking and programming languages, and an understanding of high resolution imaging, including image acquisition and storage options.

11.  B&B relied upon these representations in hiring Armogida.  He was hired

2

to sell microscopes and to sell and provide custom imaging solutions to B&B's customers.

12.  Although he was not hired to develop a specific patentable product or invention per se, I find that Armogida was hired to develop customized imaging solutions for customers.  If a customer required something that B&B did not then offer, then B&B's imaging specialists, such as Armogida, had the task of developing the product.

13  Armogida entered into an Employment Agreement in 1998 and then executed an amendment to that Agreement in June of 2001.   The amendment reflected Armogida's move to Cleveland, Ohio.

14.  The Agreement did not expressly require Armogida to assign rights in any intellectual property to B&B, nor did the Agreement expressly address inventing a particular product.

15.  The Agreement did, however, provide that Armogida would not compete, either directly or indirectly, with B&B while employed or for a period of twelve months following termination.  This provision was limited to a one hundred mile radius of any locality where B&B had retained or paid for the full-time services of any employees.

16.   The Agreement also contained a clause prohibiting Armogida from removing records of sales, service, customer lists, or any other forms, or matters of business pertaining to B&B, or any copies thereof, for his own use or for the use of others.

17. Though the term "imaging specialist" was not then used to describe Armogida's duties, Armogida essentially served as an imaging specialist. He himself began using the term "imaging specialist" to describe his duties at a later date.

18  Armogida consistently held himself out as an "imaging specialist." He used that designation on his business card and on his email signature. He explained that he was an "imaging specialist" because he could sell an imaging system based upon his understanding of how to configure software.

19  Throughout his employment, Armogida received training which enabled him to better perform his job as an imaging specialist. For instance, he attended seminars on the use of imaging software, macros and programming.

20. B&B always paid for the expenses associated with the training seminars.

21. Armogida did in fact develop custom imaging solutions for B&B's customers. He helped Domino in the development of software for the St. Gobain project because Domino was unable to customize the solution himself.

22. The St. Gobain project involved an automated imaging system. The system automatically searched for defects.

23. Armogida consistently held himself out to others as someone who had developed automated and customized imaging systems while employed at B&B. In a July 25, 2005 letter Armogida represented that he had nine years of digital microscope imaging experience and seven years of experience as an imaging specialist.

24. Armogida himself stated that one of his then recent projects included

"developing an automated system to map a crystal for optimal sectioning before installed as a gamma knife detector." See Plaintiff's Ex. 17.   Armogida also acknowledged that he "provided complete custom solution to that company to improve the quality of the detector they manufacture." Id. He references "creating solutions" for individual projects. Id.

*Development of the KPICS System*

25.  The Ohio Bureau of Criminal Investigation ("OHBCI") has been a customer of B&B for at least ten years.

26.  In February of 2005, David Navratil, a B&B employee, brought Armogida to the OHBCI to help him with a mobile cart demonstration. Navratil introduced Armogida to Dale Laux, a forensic scientist with the OHBCI, as an imaging specialist - a software specialist who understood computers.

27.  Following the mobile cart demonstration, Laux showed Armogida the OHBCI lab and discussed a product he had seen on the web made by a competitor which aided in the finding of sperm on slides.  Laux expressed an interest in purchasing a system which would automatically scan a slide to find the sperm.[1]

28.  Armogida responded that such a system could be formulated.

29.  Armogida then contacted Andrew Hunt, a co-owner of B&B, about the idea for an automated sperm finder system.  Armogida was excited about the prospect of developing such a system.

---

[1] I reject, as lacking credibility, both Navratil's and Domino's testimony that the idea for the automated sperm finder system predated Armogida's visit to the OHBCI lab.  Navratil and Domino agree that the request for an automated system came from Laux.   Laux stated, credibly, that he did not conceive of such a system until Armogida visited the lab.

30. I find that Hunt *directed* Armogida to pursue the opportunity on behalf of B&B in order to provide a custom solution to their customer - the OHBCI.

31. By fax dated February 17, 2005, acting as an employee of B&B, Armogida forwarded to the OHBCI a description of the "Automated Scanning System."  In that fax Armogida repeatedly identifies the automated scanning system as B&B's product. He stated that B&B had developed a series of complex processing to locate the sperm, and that the system would automatically make measurements, count particles, focus and save images. See Plaintiff's Ex. 28.

32. Domino, who was copied by Armogida on this fax, expressed his concern to Armogida regarding B&B's ability to deliver the quoted "Automated Scanning System."   Armogida responded that such a system could be customized for the OHBCI but that he needed certain equipment to begin working on the System. Domino then secured the equipment for Armogida.

33. On March 31, 2005, the OHBCI submitted a purchase order for six "*automated* sperm identification systems." See Plaintiff's Exhibit 31.  (emphasis added).  The purchase order included a year of free software support.

34. The System sold to the OHBCI also included an Olympus BX-61 microscope, digital cameras, motorized arms, as well as software, including the MicroSuite imaging software, a macro recorder to automate frequent operations, a stage manager to define the path for the automated analysis, an automater to collect, process and analyze images, and an image calculator to perform logical and arithmetical operations on images.

35.  The MicroSuite software is an image analysis package that is designed to support the development of customized imaging solutions.

36.  The hardware that is used in the System is not unique.  The only unique component of the System is the algorithm that was developed to automatically find the sperm.

37.  The algorithm that detects and saves the location of the sperm cells calls on the functions of the MicroSuite software and the modules to the System to manipulate images, identify the sperm cells and record their locations.

38.  It was the macros or algorithms that called upon the MicroSuite functions that made the System an automated sperm finding system.  The same results could be achieved manually.

39.  OHBCI understood that it was purchasing an automated sperm finder system from B&B.  Indeed, the start-up screen for the System at the OHBCI currently identifies the System as a "Product of B&B Microscopes."

40.  OHBCI never believed that it was purchasing an automated system from Armogida.

41.  The sale would not have been made without the commitment by B&B to develop the System as an automated scanning system.

42.  At the time the purchase was made, the System was not fully automated.

43.  It was Armogida's job, as the imaging specialist servicing the OHBCI sale, to develop the algorithm which would make the System fully automated.

44.  He was paid his salary, a commission and an additional bonus, as detailed

below, for doing such work.

45.   Armogida continued to work on the System, as was typical of many imaging sales.  Both B&B and the OHBCI fully understood that further development of the System was required.

46.  The system was installed in June of 2005, and Armogida continued to do additional work to refine the algorithm. Armogida kept Hunt abreast of his work.

47.  I reject as lacking credibility Armogida's testimony that he worked on the System on his own time and with B&B's knowledge and understanding that he was doing so for his own purposes and benefit.

48.  At each step of the process Armogida provided updates to B&B regarding development of the System, B&B provided financial support, and gave Armogida necessary equipment.  Such a course of conduct is completely inconsistent with Armogida's representation he was developing the System on his own and with B&B's knowledge.

49.   Indeed, eventually, B&B considered hiring another employee to help Armogida develop the System.

50.  In July of 2005, with Armogida's knowledge and agreement, B&B hired Othman Abdul Karim to help work on the development of the System.

51.  Abdul Karim's Confidentiality Agreement recites that:

> *B&B owns* and possesses technical and other proprietary information, including software source code relating to a "Sperm scanning and identification system"

See Plaintiff's Ex. 37 (emphasis added).

8

52.   Armogida met with Andrew Hunt and Abdul Karim on two separate occasions to discuss the further development of the System.  Armogida gave Hunt a copy of  the algorithm.

53.  While the testimony was not entirely clear, it does not appear that Abdul Karim contributed in any meaningful way to the development of the System. Neither is it clear how long he remained employed with B&B.

54.  The name of the System eventually changed from "OASIS" (the Olympus Automated Sperm Identification System) to the "KPICS" System.  "KPICS" referred to the colors of the stains used on the slides.

55.  Armogida spent approximately 1600 hours between the Summer of 2005 and January of 2006 - when the KPICS System was finally certified to use on casework - working on development of the System.

56.  That translates to roughly 200 eight hour days between the installation date at the OHBCI in June of 2005 and the certification of the KPICS System in January - or 33 eight hour days each month.

57.  I reject, as incredible, Armogida's assertion that he worked these hours on "non B&B" time.   Rather, I find that he was working on the KPICS System during B&B business hours, as a B&B employee, and for the specific purpose of delivering a fully automated sperm finder system as B&B promised the OHBCI and as directed by B&B.

58.  B&B paid Armogida a $22,000 commission on the sales of the KPICS System to the OHBCI.  He would not have received the commission had he not developed

the algorithm which automated the System.

59.  B&B also gave Armogida a $2,000 check for an "Innovation Award" in connection with the KPICS System.

60.  Armogida cashed both checks.

61.  Armogida also continued to receive his $38,000 base salary during this period of time.

*Representations Regarding Ownership of the KPICS System*

62. Throughout the development of the KPICS System, Armogida represented to B&B and to third parties that the KPICS System was owned by B&B.

63.  He continuously provided B&B owners Tim and Andrew Hunt updates on his refinement of the System.  These updates are consistent with the understanding that the development and refinement of the System were done for B&B, at B&B's direction and as a B&B employee.

64.  As stated above, had Armogida truly been pursuing this opportunity on his own, there would have been no need to constantly interact with B&B regarding the development of the System.

65.  Indeed, in a July 10, 2005 memo to Tim Hunt, Armogida suggested as a possibility for  B&B's development and protection of the product - the securing of a collaborative grant with the OHBCI. See Plaintiff's Ex. 34.

66.  He also recommended that B&B obtain a patent on the System and, short of obtaining a patent, otherwise protect the System by installing HASP keys, which would prevent reverse engineering.  See Plaintiff's Exs. 46 and 47.

67. Again, Armogida's interactions with B&B in this regard are consistent with his understanding that B&B owned the System.

68. As late as March 14, 2006, just a week before his resignation, Armogida prepared a development proposal for Andrew and Tim Hunt which identified the KPICS Sperm Finder as a "Product of B&B." See Plaintiff's Ex. 99. It recites that, "[i]n 2005, new algorithms and methods were developed by imaging specialists at B&B... ." Id. It directs interested parties to contact B&B for more information.

69. Armogida actually filed for a patent application on the KPICS System in his own name in January of 2006.[2] He did not disclose this to B&B at the time.

70. In February of 2006, Andrew Hunt sent Armogida an email regarding a summary on protecting the KPICS System. The summary read, in relevant part:

> B&B Microscopes is filing patent and copyrights on their system. With that in hand they plan on continuing marketing the KPICS Sperm Finder system to forensic scientist. They will do this by attending several of the larger shows, doing mailings with their literature, doing direct phone calls and doing demonstrations at labs where potential lies. The cost of the shows and travel to labs are considerable and will call for considerable outlays on the company's part.

See Plaintiff's Ex. 70.

71. Even though Armogida received this email after he had submitted the patent application in his own name, he remained silent about his actions.

---

[2] I find irrelevant the fact that Armogida has paid for all costs associated with the patent application and prosecution. Obviously B&B could not have paid for such costs because Armogida failed to disclose that he was pursuing such a course of conduct. I have no reason to believe that B&B would have declined to pay such costs had Armogida informed it of his actions. Indeed, all of B&B's indications had been to the contrary.

72.  Indeed, even at the time he was preparing the development proposal referenced above, which identifies the KPICS System as a "Product of B&B," he did so knowing that B&B was unaware that he lay claim to the KPICS System himself.

73.  I find that Armogida acted in a deceptive manner toward B&B.  He acted disloyally and without regard to B&B's best interest.

74.  B&B first learned that Armogida considered himself to be the "owner" of the KPICS System on or about March 14, 2006, when Armogida finally told Tim and Andrew Hunt that he had applied for a patent.  Armogida provided the information only moments before the three were scheduled to meet with attorneys for B&B to discuss obtaining a patent or special copyright on the KPICS System.

75.  Armogida's representations to third parties mirrored the representations made to B&B - that is, that the KPICS System was developed by and owned by B&B.

76.  For instance, the manual Armogida prepared for the KPICS System provided that anyone needing technical support should contact Armogida of *B&B Microscopes*.  It also included Armogida's *B&B email address*.  See Plaintiff's Ex. 43.

77.  The start up image on the computer for the KPICS System, which Armogida created, identifies the KPICS Sperm Finder as a "Product of B&B Microscopes, Ltd." See Plaintiff's Ex. 55.

78.  Armogida's testimony that his use of the phrase "a Product of B&B" was not intended to indicate that B&B owned the KPICS System and was instead intended only to suggest that B&B could, if the parties agreed, distribute the System under its private label, is incredible.  There is no documentation suggesting the

parties ever discussed such an approach and Armogida's testimony is inconsistent with all other testimony on record, which I accept as more credible on this point.

79.  B&B actively marketed the KPICS System on a national level at two forensic shows.

80.  The first show - the Midwest Conference for Forensic Scientists - was held in St. Louis, Missouri during the Fall of 2005.

81.  Armogida designed two banners to be used at the Midwest Conference. The banners advertised the "KPICS Sperm Finder" and the "KPICS Sperm Finder Light."[3]  Both banners identify the KPICS System as a "Product of B&B."  <u>See</u> Plaintiff's Exs. 78 and 79.

82.  The brochure Armogida developed for the Midwest Conference contained a similar representation.  <u>See</u> Plaintiff's Ex. 80.  It also directed interested individuals to contact B&B for more information.

83.  B&B made the arrangements to attend the conference and paid for the expenses associated with the conference except for those expenses which Armogida did not submit.

84.  The demonstration of the KPICS System performed at the conference was done using B&B equipment.

85.  Armogida also made numerous representations regarding the KPICS System in connection with a meeting of  the American Academy of Forensic

---

[3] The "KPICS Sperm Finder Light" is a less expensive version of the KPICS Sperm Finder which allows a purchaser to subsequently upgrade.

Sciences ("AAFS"), held February 20-25, 2006 in Seattle, Washington.

86.  For instance, an abstract he prepared to submit to the AAFS contained the following language:

> "KPICS Sperm Finder ™, *developed by B&B Microscopes, Ltd*, is currently being validated jointly by the Ohio Bureau of Criminal Identification and B&B Microscopes Ltd for use in forensic laboratories.

<u>      See</u> Plaintiff's Ex. 38 (emphasis added).

87.  In the application (which Armogida sent to Tim and Andrew Hunt for their review), Armogida states that B&B is the manufacturer / provider of the KPICS System and would financially support the presentation and that the presenter - Armogida - is a B&B employee.

88.  B&B paid for the booth and other expenses associated with the Seattle show. <u>See</u> Plaintiff's Ex. 89.  B&B also provided the equipment necessary to do the demonstrations of the KPICS System. <u>See</u> Plaintiff's Ex. 87.

89.  Though Armogida did not submit his travel expenses, I find credible B&B's assertion that it would have paid them had he submitted them.  Further, I accept as credible the testimony that Armogida traditionally waited until year end to submit his expenses.

90.  The booth and materials distributed at the AAFS show relating to the KPICS System identified the System as a product of B&B.

91.  Armogida also made representations about the KPICS System relating to a joint effort with Roger Kahn, the Forensic Biology Director of the Harris County

Medical Examiner's Officer in Houston, Texas, to secure a funding from the National Institute of Justice ("NIJ").

92.   Throughout the Fall of 2005, Armogida engaged in a series of emails with Kahn regarding funding from the NIJ. Armogida sent the emails from his B&B email address, he identifies the KPICS System as a "Product of B&B", he uses the pronoun "we" when discussing the versions of the KPICS Systems currently offered and the refinements being made to the System; he discusses the resources being provided by "our company"; and he signs the emails with his B&B contact information. See Plaintiff's Exs. 57 - 59.

93.   The various drafts of the proposal to be submitted to the NIJ which Armogida prepared reference "[p]reliminary work done by B&B" with respect to automated microscope sperm search capability. See Plaintiff's Exs. 60, 61 (stating that "B&B Microscopes, Ltd. created an automated sperm finder using commercially available hardware and software, and termed the system KPICS Sperm Finder.").  The proposal also concedes that a number of the algorithms used in the KPICS System "were developed by B&B Microscopes' imaging specialists." Id.

94.   The proposal represents that B&B would supply the Harris County Medical Examiner's Forensic Biology Laboratory with an automated sperm search system and train personnel on its use and that B&B personnel would improve and create new algorithms.

95.  Further, the proposal acknowledges that "[d]evelopment thus far has been supported 100% through B&B Microscopes, Ltd." Id.

96.  Relying on the submissions prepared by Armogida, the NIJ approved the first part of the two part application process.  <u>See</u> Plaintiff's Ex. 63.  In so doing, it noted that "[t]o date, development of this microscope system has been funded by B&B Microscopes, Ltd...."

97.  In moving forward for further consideration of the NIJ grant, Armogida authored a February 26, 2006 "letter of cooperation" to Kahn.  Significantly, he wrote the letter on behalf of B&B ("[t]his letter confirms B&B Microscopes, Ltd. interest in continued development of an automated sperm detection system." <u>See</u> Plaintiff's Ex. 67.

98.  Following Armogida's resignation from B&B, Armogida began, for the first time (other than in conjunction with the patent application), representing that the KPICS System was his, rather than B&B's.

99.  For instance, he sold a "KPICS Sperm Finder Light" system to the State of Utah for $38,500, using the lead for the sale that Tim Hunt had forwarded to him while he was an employee of B&B. <u>See</u> Plaintiff's Ex. 98. "Sperm Finder Light" was one of the systems being marketed by B&B Microscopes at the forensic shows.

100.  Armogida marketed and sold the KPICS System on behalf of "Advanced Imaging Corporation." <u>See</u> Plaintiff's Ex. 102.

101. The profit that B&B would have realized on that sale was approximately $8,000 to $10,000.00.

102.  Armogida developed marketing materials on behalf of Advanced Imaging Corporation which referenced the KPICS System.  No mention in such

materials is made to B&B. See Plaintiff's Ex. 100.

103.   Also after Armogida resigned, he attended a workshop of forensic scientists in Richfield, Ohio in May of 2006.  Armogida distributed information relating to the KPICS System to those in attendance.  The information did not contain any reference to B&B.

*Destruction of Computer Data*

104.   On March 6, 2006, B&B conducted a sales and training meeting in Pittsburgh, Pennsylvania.  All sales representatives and imaging specialists were required to attend.

105.   During the meeting, B&B requested that all representatives and specialists turn in their laptops so that a vendor could install an upgrade to B&B's email system.

106.  Armogida left the meeting ostensibly to retrieve his laptop, but never returned.

107.  Instead, Armogida sequestered himself in his hotel room during the evening of March 6, 2006 through the early morning hours of March 7, 2007, ignoring repeated phone calls and knocks on the door, and selectively deleted and overwrote thousands of files from the laptop.

108.  Having finished the task, Armogida left the laptop with a co-worker then returned home to attend to the needs of his father who had been hospitalized.

109.  B&B retained Ideal Integrations to perform a forensic examination of the laptop.

17

110.  The examination revealed that Armogida had deleted or overwritten every file relating to the KPICS System, including: the OHBCI; "grants"; "patent"; "brochure"; "software design"; "Testing Jan 2006 Version 3_9_8_4_7"; and "Banner."

111.  The examination also revealed that Armogida had deleted or overwritten many files/folders which did not relate to the KPICS System, but which pertained to other B&B business, such as: "DSU Information"; "DSU Customer Presentation"; "Comparison of Competitors"; "Customer Contacts"; "Customers"; "Inventory"; "Orders"; "Pricing"; "Quotes"; "New Quotes" and "St. Gobain Stage."

112.  I find that Armogida took such actions intentionally and for the purpose of depriving B&B of vital information relating to the KPICS System.  Armogida knew that his laptop computer contained the only copy of the algorithm for the KPICS System to which B&B had access.  By deleting that information, Armogida ensured that B&B could not market, sell and / or distribute the KPICS System.

113.  B&B paid $1,400 for the forensic examination.

*Inventory*

114.  Ann Hunt is B&B's Office Manager.

115.  Ann Hunt, together with other B&B employees, handles and tracks inventory control.

116.  B&B had a written inventory policy in place during Armogida's employment.  That policy provided that all demonstration equipment and inventory was the responsibility of each sales and service representative. See Plaintiff's Ex. 105.

117.  Following Armogida's separation from employment, B&B claimed that

Armogida had failed to return $38,659.98 in inventory, valued at cost.

118.  I reject B&B's contention in this regard.

119.  On March 27, 2006 Andre Domino arrived at Armogida's house to retrieve Armogida's remaining inventory.  Domino made a written record of the inventory he was collecting.  There was no suggestion that Armogida had a hidden cache of inventory he was withholding from Domino. Nor did Domino indicate that Armogida refused to return any of the inventory.

120.  Indeed, B&B did not introduce any evidence indicating that Armogida actually ever possessed any of the inventory in question.  Most of the inventory B&B alleges it sent to Armogida was dropped off at his residence and no signature was required to verify delivery.

121.  Further, B&B's entire inventory verification system appeared prone to errors.  The employee that maintains records relating to the inventory did not handle the physical inventory.

122.  Several other B&B employees testified that it was not unusual for mistakes to occur with B&B's tracking of its inventory.

123.  I find this testimony to be credible and consistent with the other testimony and evidence of record.

124.  Thus, in this limited circumstance, I find credible Armogida's representation that he did not have the inventory which B&B accuses him of not returning.

*Fees and Costs*

125.  B&B incurred legal fees to the date of trial in the amount of $155,575.00 and costs in the amount of $18,200.00.  The legal fees were based upon substantial discounts given by Attorney Gary Hunt, brother of B&B co-owners Tim and Andrew Hunt.

## CONCLUSIONS OF LAW

*Ownership of the KPICS System[4] - and Count I of Counterclaim[5]*

126.  B&B does not own the KPICS System by virtue of an express assignment clause in Armogida's employment contract.

127.  Absent an express assignment of invention clause, Pennsylvania courts consider several factors to determine who has ownership rights in an invention. See Aetna-Standard Engineering Co. v. Rowland, 343 Pa. Super. 64, 493 A.2d 1375, 1381 (1985).

128.  Those factors include: (a) the job duties the employee has at the time of the inventive work; (b) whether the employee received compensation for his or her efforts; and (c) any representations made by the employee to the employer and third parties regarding ownership of the invention. Sim Kar Lighting Fixture Co. v. Genlyte, Inc., 906 F. Supp. 967 (D. N.J. 1995) (applying Pennsylvania law); and

---

[4] Because I find that B&B owns the KPICS System, I decline to issue conclusions of law on the alternative theories B&B set forth regarding ownership interests.

[5] Prior to trial, Armogida withdrew all counterclaims except for his claim for a declaration of ownership in the KPICS System and tortious interference with prospective employment and business relations. See Docket No. 123, p. 1. During trial, Armogida withdrew his claim for tortious interference. Id., pg. 2.

Gruenwald v. Advanced Computer Applications, Inc., ___ Pa. Super. ___, 730 A.2d 1004, 1013 (1999); see also Teets v. Chromally Gas Turbine Corp., 83 F.3d 403 (Fed. Cir. 1996) (applying Florida law, but relying upon the same cases relied upon in Aetna Standard).

129.  During the relevant period of time, Armogida worked as an imaging specialist, whose duties were to develop custom solutions for B&B's customers.

130.  In other words, for each sale, Armogida was required to "solve a particular problem." See University Patents, Inc. v. Klingman, 762 F. Supp. 1212, 1219-1220 (E.D. Pa. 1991). Obviously, Armogida was not under a new contract for hire with respect to each prospective sale.  Nevertheless, he was required to assess a customer's needs and if that customer required something custom, then develop a custom solution.

131.  In this particular case, he quoted the OHBCI, as a B&B employee, an *automated* sperm finder system.

132.  When the OHBCI submitted a purchase order for the automated sperm finder systems, B&B *directed* Armogida to develop that system and provided him the necessary equipment, time and support to accomplish that goal.

133.  Consequently, Armogida began working on the invention pursuant to a direct order from B&B and as a part of his job duties.

134.  Additionally, Armogida received compensation for the development of the KPICS System.  He received $22,000.00 in commissions on the sale of the KPICS Systems to the OHBCI.

135.  The uncontradicted testimony established that the sale to the OHBCI would not have gone through absent the development of an automated system.

136.  The question is not whether, in hindsight, Armogida believes that the commission is fair compensation for the amount of time he put into developing the KPICS System.

137.  Clearly along the way, Armogida began to have second thoughts about his efforts.  I believe these second thoughts are what led him to begin deceiving B&B and acting in his own interest.  Nevertheless, he was paid a commission as well as $2,000.00 for an "Innovation Award" for his work on the KPICS System.

138.   The fact that Armogida was specifically directed to develop the automated sperm finder, was paid for such development and accepted payment, distinguishes the circumstances in the case at bar from those in <u>Aetna-Standard Engineering Co. v. Rowland</u>, 343 Pa. Super. 64, 493 A.2d 1375 (1985).

139.  Finally, it is well documented that Armogida represented to both B&B and third parties that B&B owned the KPICS System.

140.  The only time during his employment with B&B that Armogida did not represent the KPICS System to be owned by and a product of B&B, was when he filed for a patent on the System, in his own name, and without ever informing B&B.

141.  Acknowledging the absence of an express assignment of invention clause, and having carefully considered all the circumstances relating to the employment relationship and development of the KPICS System, I conclude that, as a matter of law, B&B is the owner of the KPICS System and is entitled to an

assignment of the Provisional Patent Application No. 60/760,163.

*Counts I and II - Theft of Trade Secrets, Uniform Trade Secrets Act, 12 Pa.C.S.A. §5301*[6]

142.  The Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A.  § 5301 et seq. makes it unlawful to disclose or use the trade secret of another without consent.

143.  The PUTSA defines a "trade secret" as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S.A. § 5302.

144.  The KPICS System constitutes a "trade secret" within the meaning of the PUTSA.

145.  B&B engaged in extensive efforts to develop the KPICS System and also devoted substantial resources to market the KPICS System.

---

[6] In Count I of the Complaint, B&B alleges that Armogida also misappropriated additional electronic information such as customer lists and telephone numbers.  B&B did not include any such Proposed Conclusions of Law regarding such allegations with respect to its Theft of Trade Secrets in Count I of its submissions.  Consequently, I presume that B&B is no longer pursuing such an allegation.  To the extent that it is, I find that relief under the PUTSA in this respect is unwarranted, as there was no suggestion that Armogida misappropriated customer names or telephone numbers.

146.  That the KPICS System derives independent economic value, actual or potential, from not being generally known, is evidenced both from Armogida's efforts to patent the System, and the sales to the OHBCI and to the State of Utah.

147.  Further, B&B undertook reasonable efforts to maintain the secrecy of the KPICS System.  B&B purchased "HASP keys" and arranged to have them sent to Armogida for installation on the KPICS System.

148.  It is unclear whether the HASP keys were ever installed.  That they might not have been, however, would have been due to Armogida's deceptive acts rather than B&B's failure to take reasonable steps under the circumstances.

149.  Because  B&B  reasonably  believed,  based  upon  Armogida's representations, that the HASP keys had been installed and that such keys prevented reverse engineering, its failure to obtain non-disclosure agreements from the OHBCI and / or Roger Kahn is not fatal to its claim.

150.  Armogida's access to the KPICS System was obtained in confidence and only by virtue of his employment with B&B.  He "acquired" the trade secret information while employed by B&B in a position of trust.  He was directed by B&B to develop an automated system for the OHBCI.  He was encouraged and required to refine the system and to market the system at various forensic conferences.  B&B supported him in seeking grant funding for further development.  He knew that the KPICS System was owned by B&B and should be treated as a trade secret.

151.  Armogida  took the KPICS System with him when he resigned and essentially began competing against B&B. He deleted all references to the KPICS

System on his laptop, overwrote the data and refused to give B&B a copy after he resigned - thereby depriving B&B of the trade secret itself.

152.  Armogida then marketed the KPICS System as his own property, both to the State of Utah and to a group of forensic scientists in Ohio.  In each instance, he did so without the express or implied consent of B&B.

153.  Because Armogida misappropriated B&B's trade secret, B&B is entitled to actual damages of $ 10,000 - representing the lost profit on the sale to Utah.

154.  Additionally, I find that Armogida's actions were willful and malicious. Armogida spent months letting B&B believe that he was working in its best interest. He used B&B's name, reputation, contacts and resources to develop the KPICS System.  He then resigned, taking with him the KPICS System knowing full well that, not only was he misappropriating a trade secret, but that he would simultaneously be depriving B&B of the ability to use that trade secret.  He acted with intent and with a reckless indifference to B&B's rights.

155.  B&B therefore is entitled to recover exemplary damages in the amount of $ 20,000, plus attorneys' fees and costs incurred in this action, 12 Pa. C.S.A. § 5304 and 5305.

*Counts III and IV - The Computer Fraud And Abuse Act, 18 U.S.C. § 1030*

156.  The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 is a criminal statute which penalizes unauthorized access to computers. See P.C. Yonkers, Inc. v. Celebrations The Party And Seasonal Superstore, LLC, 428 F.3d 504, 510 (3d Cir. 2005).

157.  The CFAA also, however, contains a civil remedy and "'[e]mployers ... are

increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system.'" P.C. Yonkers, 428 F.3d at 510 (citations omitted) (bracket added).

158.  The civil remedy is available to "[a]ny person who suffers damage or loss by reason of a violation of this section... ." 18 U.S.C. § 1030(g).

159.  The claimant may bring an action "to obtain compensatory damages and injunctive relief or other equitable relief." Id.

160.  However, a civil action is only available "if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv) or (v) of subsection (a)(5)(B)." 18 U.S.C.   § 1030(g).

161.  That provision reads, in context, that whoever:

> (5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer,
>> (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct recklessly causes damage; or
>> (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
>
> (B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused ... (i) loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value...

18 U.S.C. § 1030(a)(5).

162.  Additionally, "[d]amages for a violation involving only conduct described

26

in subsection (a)(5)(B)(i) are limited to economic damages." 18 U.S.C.  § 1030(g).

163.  Armogida's laptop computer constitutes a "protected computer" within the meaning of the CFAA. <u>See</u> 18 U.S.C. § 1030(e)(2).

164.  B&B does not clearly identify which provisions of the CFAA Armogida violated.[7]

165.  Presumably its reference in Paragraph 40 of its Proposed Conclusions of Law to § 1030(a)(5)(A)(i)-(iii) is meant to suggest that Armogida violated these particular subsections.

166.  I reject any contention that Armogida's conduct in accessing the laptop computer provided to him by B&B and deleting and / or overwriting B&B business files constitutes a violation of § 1030(a)(5)(A)(ii) or (iii).

167.  These subsections require that the user *access* a protected computer *without* authorization.  Armogida clearly had authorization to use the laptop in question.

168.  To the extent that certain courts have found that once an employee begins violating a duty of loyalty to his employer any authorized access is withdrawn, <u>see</u> <u>International Airport Centers LLC v. Citrin</u>, 440 F.3d 418 (7th Cir. 2006), <u>Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.</u>, 119 F. Supp.2d 1121, 1124-25 (W.D. Wash. 2000) , I find such cases unpersuasive and nonbinding for the reasons set forth in <u>Lockheed Martin Corp. v. Speed</u>, 2006 WL 2683058 at * 4 (M.D. Fla.

---

[7]It argues that Armogida's use of scrubbing software violated section 1030(e)(8)- but that section contains only definitions not a description of prohibited acts.

Aug. 1, 2006),cited with approval by, Brett Senior & Associateds, P.C., v. Fitzgerald, Civ. No. 6-1412, 2007 WL 2043377 at * 4 (E.D. Pa. July 13, 2007).

169.  The CFAA delineates between authorized and unauthorized access.  The Citrin and Shurgard courts' reading of the statute would render this distinction meaningless.

170.  I do, however, find that Armogida's same conduct does constitute a violation of § 1030(a)(5)(A)(i).   Section 1030(a)(5)(A)(i) is not predicated upon unauthorized *access* of a protected computer.   Instead, it is predicated upon unauthorized *damage* to a computer.

171.  Paragraph 5 of Armogida's employment contract precluded Armogida from removing B&B records of sales, service, customer lists, or other matters of business pertaining to B&B. See Plaintiff's Ex. 6.

172.  There is no dispute that Armogida acted knowingly and with intent when he deleted the files on the laptop.  Those files included, among other things, records of sales, service, customer lists and other matters of business pertaining to B&B - most significantly - matters relating to the KPICS System.

173.  The deletion of the files relating to the KPICS System have rendered that information unavailable to B&B.  B&B is unable to retrieve that data.

174.  Consequently, Armogida's actions in this regard caused damage to the underlying data within the meaning of  § 1030(a)(5)(A)(i) and (e)(8) .

175.  Having determined that B&B has suffered the type of harm for which civil redress is available, I still must determine whether B&B has sustained at least

$5,000 in loss, during any 1 year period, as a result of the harm referenced above. See 18 U.S.C. § 1030(a)(5)(B)(i) .

176.  "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. See 18 U.S.C. § 1030(e)(11).

177.   B&B sustained a loss of $1,400 relating to the costs incurred in performing a damage assessment.  I find such costs to be reasonable under the circumstances.

178.  Additionally, B&B sustained a loss of $10,000 relating to lost revenue because of an "interruption of service."

179.  As stated above, B&B was deprived of the opportunity to sell the KPICS System when the data related to the KPICS System was deleted from Armogida's laptop.

180.   B&B had no other access to the underlying algorithm necessary to reproduce the KPICS System.  Its attempts to secure the information from the OHBCI were rebuffed.

181.  Accordingly, the loss of the data from Armogida's laptop constituted an interruption of service within the meaning of  18 U.S.C. § 1030(e)(11) and 18 U.S.C. § 1030(a)(5)(B)(i).

182.  I reject, as too speculative, B&B's contention that it lost $50,000.00 in

revenue from the first year of sales of the KPICS System.

183.  Instead, I find that B&B lost $10,000 in profit from the sale Armogida made of the KPICS System to the State of Utah.

184.  The $1,4000 cost of conducting the damage assessment and the $10,000 in lost profit from the State of Utah sale satisfy the jurisdictional requirement set forth in 18 U.S.C. § 1030(a)(5)(B)(I).

185.  B&B is entitled to an award of damages in the amount of $11,4000 representing the amounts set forth above.

186.  Additionally, I find that B&B is entitled to injunctive relief directing Armogida to return to B&B all data he retained from the laptop computer, including all data relating to the KPICS System  as it existed the day he deleted the information.

*Counts V , VI and VII - Breach of Contract*[8]

187.  B&B seeks an award for what it believes constitute several breaches of Armogida's employment contract and / or the terms of his employment.

188.  To prevail on its breach of contract claims, B&B must prove: (1) the existence of a contract, including its essential terms; (2) that Armogida breached that contract; and (3) that it suffered harm as a result. See Ware v. Rodale Press, Inc., 322 F.3d 218, 225-226 (3d Cir. 2003) (citations omitted).

189.  As stated above, Armogida was obligated to keep track of and return all

---

[8] Though the Complaint contained a claim for breach of the duty of loyalty, B&B has not submitted separate findings of fact or conclusions of law on this issue, so I decline to make any rulings in this regard.

inventory at the termination of his employment.

190.  B&B contends that Armogida failed to return inventory valued at a cost of $38,659.98.

191.  For the reasons set forth above, I reject this contention and conclude that Armogida did not breach this term of his contract.

192.  B&B also alleges that Armogida breached his employment contract insofar as he deleted information belonging to B&B from the laptop computer.

193  As set forth above, I agree that Armogida did delete, without authority, B&B's business records.

194  I further conclude that B&B is entitled to $11,400.00 as compensation for such a breach, representing the lost profit resulting from the deletion and the cost of identifying those files actually deleted.

195.  As stated above, Armogida's employment contract also precluded him from competing with B&B during or after his employment.

196.  Paragraph 4 of his Employment Agreement precluded him from directly or indirectly engaging in the microscope or imaging business on behalf of himself or any other person or entity, "within one hundred miles of any locality where B&B has retained or paid for the full-time services of any person or persons, partnerships or corporations either on an employment or an independent contract basis in pursuit of B&B's business." See Plaintiff's Ex. 6.

197  B&B contends that, "[f]ollowing his resignation, Armogida actively marketed products competing with B&B Microscopes, including the KPICS System,

through his web site and through his presentation of the KPICS System and distribution of marketing materials regarding the KPICS System at the offices of the OHBCI in May of 2006 during the Midwest Association of Forensic Scientists Workshop." See Docket No. 122, p. 24.

198.  I agree that, at a minimum, Armogida's presentation of the KPICS System and distribution of marketing materials relating to the KPICS System at the Conference constitutes a breach of Paragraph 4 of the Employment Agreement.

199.  Therefore, in accordance with the terms of the Employment Agreement, the twelve month period during which Armogida is precluded from competing shall run from the date of the final Order of Court and Armogida is obligated to pay all reasonable attorneys' fees and expenses incurred in connection with pursuing this claim.

*Count IX - Unfair Competition*

200.  "A claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival." Synthes (USA) v. Globus Medical, Inc., Civ. No. 4-1235, 2007 WL 2043184 (E.D. Pa. July 12, 2007) (citations omitted).

201.  To prevail on its claim of unfair competition, B&B must establish that it had the right to the exclusive use of the KPICS System name; that Armogida used a confusingly similar name; and that such use caused a likelihood of confusion in B&B's competitive area. See Brody's Inc. v. Brody Bros., Inc., 308 Pa. Super. 417, 421, 454

A.2d 605, 607 (1982) (citation omitted) and J.G. Wentworth, S.S.C. v. Settlement Funding LLC, Civ. No. 6-597, 2007 WL 30115 at *1-3 (E.D. Pa. Jan. 4, 2007) (holding that the test for common law trademark infringement and unfair competition is virtually identical as the test for trademark infringement and unfair competition under the Lanham Act, save for the requirement of an effect on interstate commerce, and that to establish a violation of the Lanham Act, a plaintiff must demonstrate that the mark is valid and owned by plaintiff and that the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services).

202.  As set forth above, B&B was the owner of the KPICS and as such, had the right to the exclusive use of the KPICS name.

203.  Armogida marketed the KPICS System under the same name and as his own product.

204.  Armogida marketed the KPICS System in B&B's competitive area.

205.  Consequently, I conclude that B&B has succeeded in demonstrating that Armogida has engaged in unfair competition.

206.  B&B is entitled to $10,000 in damages, representing what it would have made on the sale of the KPICS System to the State of Utah.  B&B did not proffer any other non-speculative evidence regarding any sales of the KPICS System Armogida completed or what the profit from any such sales would have been.

Count X - Conversion

207.  B&B seeks to hold Armogida liable for conversion relating to his actions

33

regarding the KPICS System and the inventory it contends he failed to return.  B&B also contends that Armogida converted other B&B business data.

208.  For the reasons set forth above, B&B has not sustained its burden of proof in demonstrating that Armogida converted B&B's inventory.

209.  With respect to the contention that B&B converted the KPICS System, Pennsylvania law recognizes conversion claims based upon trade secrets. See American Hearing Aid Associates, Inc. v. GN ReSound North America, 309 F. Supp.2d 694, 705 (E.D. Pa. 2004) (citations omitted).

210.  In order to succeed on its conversion claim, B&B must prove that: (1) it owns a trade secret; (2) the trade secret was communicated to Armogida within a confidential relationship; and (3) Armogida used the trade secret to B&B's detriment. American Hearing Aid, 309 F. Supp.2d at 705, quoting, Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc., No. 00-3683, 2001 856946 at * 8 (E.D. Pa. July 26, 2001).

211.  As previously established, B&B did own a trade secret - the KPICS System. That trade secret was communicated to Armogida within a confidential relationship and he used the trade secret to B&B's detriment when he began competing directly against B&B by using the KPICS System.

212.  Consequently, I find that B&B has proven its claim of conversion insofar as it relates to the KPICS System and that it is entitled to $10,000 in damages, representing the lost profit on the sale to the State of Utah.

213.  B&B has not, however, sustained its burden of proof in demonstrating that Armogida converted other B&B business data not related to the KPICS System.

Though he may have deleted such data from the laptop computer, a conversion claim requires more - that the information qualified as trade secrets and that Armogida used such information to B&B's detriment.  B&B did not carry its burden of proof in establishing either that such information qualified as trade secrets or that, even presuming such status, Armogida used such information to B&B's detriment.

* * * * * * * * * * * * * * * * * * * * * *

## ORDER OF COURT

AND NOW, this  **25th**  day of September, 2007, after careful consideration, and for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, I enter the following Order:

(1) Armogida is required to assign the Provisional Patent Application No. 60/70,163 to B&B;

(2) Armogida is required to provide B&B with all the non-personal data deleted from the laptop computer.  Such data shall include all information relating to the KPICS System, including the algorithm as it existed on that day.

(3) Armogida is required to provide B&B with the KPICS System as it existed on the date of his termination of employment, but no updates to the System which he may have made from that date on.

(4) Armogida is precluded from competing against B&B for a period of twelve months from the date of this Order.

(5) B&B is entitled to compensatory damages in the amount of $11,400 and

exemplary damages in the amount of $20,000.

(6) B&B is entitled to reasonable attorneys' fees and costs.

(7) B&B shall submit its proposed fees and costs within two weeks of the date of this Order.  Any objections thereto shall be filed two weeks thereafter.

Judgment is entered in favor of Plaintiff and against Defendant.  This case is closed forthwith.


BY THE COURT:



/S/   Donetta W. Ambrose

  Donetta W. Ambrose,
  Chief U. S. District Judge

36